# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

NEW MEXICO HORSEMEN'S ASSOCIATION,

    Plaintiff,

v.                                                       Case No. 1:21-cv-00592-JHR-KK

SAM BREGMAN, in his individual capacity,
JOHN BUFFINGTON, in his individual capacity,
DAVID "HOSSIE" SANCHEZ, in his individual capacity;
BILLY G. SMITH, in his individual capacity;
all Commissioners of the NEW MEXICO RACING
COMMISSION, a part of the Tourism Department of
the State of New Mexico; and
THE NEW MEXICO RACING COMMISSION,

    Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS ALL FEDERAL CLAIMS AND FOR QUALIFIED IMMUNITY

        THIS MATTER comes before the Court upon Defendants' Motion to Dismiss All Federal Claims (Counts 1, 2, 3, and 4) and for Qualified Immunity ("Motion") (Doc. 17). Defendants seek dismissal of Plaintiff New Mexico Horsemen's Association's ("Plaintiff") four federal claims for failure to state a claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6) and on the basis of qualified immunity. Plaintiff responds by withdrawing its claim for a violation of substantive due process under the federal constitution, but it still asserts that its remaining federal counts state a claim upon which relief may be granted and that a determination of qualified immunity is premature. Doc. 29. Having reviewed the parties' submissions and the applicable law, the Court finds that the Motion (Doc. 17) is well-taken in part and therefore GRANTS it in part.

## BACKGROUND[1]

Plaintiff is a nonprofit corporation, the aim of which is "to actively promote the general welfare and health of licensed owners, trainers, and grooms (the Horsemen) who race in the State of New Mexico." Doc. 4 ¶ 11. Membership in this organization requires a fee of 1% of all monies won in a horse race and a total of $7 for each live racing start—$5 for a medical fund and $2 for a political action committee. *Id.* ¶ 15. New Mexico racehorse owners who do not wish to be members of this organization may opt out in writing. *Id.* ¶ 12.

One of Plaintiff's roles is financial in nature. Plaintiff is responsible for maintaining a share of 20% of the net revenue from "racinos" (racetracks with a casino attached) in designated bank accounts for each track and disbursing those funds to the tracks for payment of race purses. *Id.* ¶¶ 13, 56. In horse racing, a "purse" is the fund of money for which the racers are competing. *See* Doc. 4-1 ¶ 4. In other words, Plaintiff serves as a custodian over 20% of the net revenue from the racinos, manages the accounts containing that revenue, and then disburses the funds as an award to the winners of the races. Doc. 4 ¶¶ 13, 17, 56. As compensation for serving as custodian over the accounts, Plaintiff receives 20% of the interest from these accounts as an administrative fee. *Id.* ¶¶ 18, 58. The quantity of purse money contained in the accounts that Plaintiff manages totals approximately thirty to forty million dollars annually. *Id.* ¶ 57. Nonetheless, the interest Plaintiff receives for managing these accounts does not cover the costs of managing them, so Plaintiff requires membership fees as discussed above. *Id.* ¶¶ 61–63.

Defendant New Mexico Racing Commission (the "Commission") is part of New Mexico's Tourism Department. *Id.* ¶ 27. It is a governmental body that regulates the horse racing industry.

---

[1] On this motion to dismiss under Rule 12(b)(6), the Court takes all factual allegations in the Amended Complaint as true and draws all inferences in the light most favorable to Plaintiff. *See Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1305 (10th Cir. 2020).

*Id.* ¶¶ 35, 37. The Commission passed a regulation, N.M. Admin. Code 15.2.2(A)(11), which Plaintiff believed to be contrary to New Mexico law. *Id.* ¶¶ 66–67. Based on this belief, Plaintiff filed for a declaratory judgment against the Commission in New Mexico state court on December 2, 2020. *Id.* ¶ 67. Plaintiff also objected to other actions by the Commission, including, for example, changes or cancellations in the race meet schedule during the COVID-19 pandemic and the failure to demand that racetracks be kept in a safe and clean condition. *Id.* ¶¶ 73–76 (listing other grievances in addition to these). Because of this lawsuit, Defendant Chairman of the Commission Sam Bregman did not permit Plaintiff to contact the Commission or participate in Commission meetings except through its attorney. *Id.* ¶ 88.

Subsequently, on May 20, 2021, Defendants voted to pass an order that Plaintiff alleges removes a significant portion of its funding. *Id.* ¶ 77. Specifically, the order compelled Plaintiff to "take all action necessary to stop all processes in place by which the One Percent (1%) Purse Diversion, $5.00 Starter Fee, and $2.00 PAC Fee is transferred to and/or collected by the New Mexico Horsemen's Association." Doc. 4-1 at 3. The order explained that the Commission had not authorized diversion of these fees directly from purses to Plaintiff, and as a result it passed a motion "prohibiting the New Mexico Horsemen's Association from continuing to take from gaming tax revenue legislatively mandated solely for purses" the membership fees. *Id.* at 2–3 ¶ 8. Plaintiff alleges that this order misapprehends the process by which Plaintiff takes its membership fees; rather than taking the fees directly from purses, Plaintiff takes the fees from the money allocated to each racer after winning. Doc. 4 ¶ 89.

Plaintiff alleges that Defendants passed this order with the aim to decrease Plaintiff's funding in retaliation for Plaintiff's lawsuit and objections to Defendants' conduct. *Id.* ¶ 102. In addition to claims under state law not addressed in this Memorandum Opinion and Order, Plaintiff

alleges four federal counts under 42 U.S.C. § 1983: Counts 1 and 3 for injunctive relief and damages based on the First Amendment to the federal constitution, and Counts 2 and 4 for injunctive relief and damages based on the Fifth and Fourteenth Amendments to the federal constitution. *Id.* ¶¶ 119–198.

Defendants seek dismissal of these four counts under Rule 12(b)(6). Doc. 17. They make two main arguments in support of this point: that the counts each fail to state a plausible claim because the order merely "reinforces long-existing laws and regulations" governing purse fund management, *id.* at 6, and that the individual Defendants are entitled to qualified immunity because Plaintiff has not plausibly alleged violations of any clearly established constitutional rights, *id.* at 7–12. Plaintiff responds that its allegations all state plausible violations of clearly established law sufficient to survive a motion to dismiss and avoid the pitfalls of qualified immunity. Doc. 29. Plaintiff adds that at this stage, a determination of qualified immunity would be premature because Plaintiff has not yet had the opportunity to obtain evidence in discovery to shed light on Defendants' retaliatory motives. *Id.* at 13.

**ISSUES**

The Court identifies the following major issues to be decided with regard to whether the Amended Complaint states a claim on its face:

1. Whether a new regulation eliminating a source of Plaintiff's funding is a violation of the First Amendment by hindering Plaintiff's advocacy, association, and assembly efforts,

2. Whether the regulation is retaliatory in violation of the First Amendment,

3. Whether the restrictions on speech at the May 20, 2021 meeting during which the regulation was voted upon violated the First Amendment, and

    4. Whether the membership fees that the regulation forbids Plaintiff from collecting are a legitimate property interest.

If the Amended Complaint does state a claim on its face, the Court will move to a qualified immunity analysis and consider whether 1) any alleged violation was clearly established and 2) a determination of qualified immunity is premature at this time.

## APPLICABLE LAW

### I. Motion to Dismiss

Rule 12(b)(6) allows a party to move to dismiss a case for failure to state a claim upon which relief can be granted. When ruling on such a motion, a court looks to the complaint, accepts all well-pleaded factual allegations therein, and construes them in the plaintiff's favor to the extent possible. *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1304 (10th Cir. 2020). However, a court need not accept legal conclusions unadorned by factual support. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, the plaintiff must put forth facts stating a claim to relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility, while more than possibility, does not need to reach the level of probability. *Id.*

### II. Qualified Immunity

Qualified immunity protects government officials acting in their individual capacity from civil damages liability when their actions do not violate clearly established law of which a reasonable person would have been aware. *Fletcher v. Burkhalter*, 605 F.3d 1091, 1095 (10th Cir. 2010); *Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005). One purpose of qualified immunity is to protect public servants from the expense and distraction of liability as they perform their official duties, and as a result, it protects "all but the plainly incompetent or those who knowingly violate the law." *Callahan v. Unified Gov. of Wyandotte Cnty.*, 806 F.3d 1022, 1026 (10th Cir.

2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A qualified immunity analysis contains two prongs: first, whether the defendant's action violates a constitutional or statutory right, and second, whether that right was "clearly established" when the defendant acted. *Pearson*, 555 U.S. at 232. Once a defendant asserts a qualified immunity defense, the plaintiff bears the burden of proof on these two elements. *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001).

## ANALYSIS

### I.     First Amendment Assembly and Association Rights

Plaintiff argues that the Commission's order to "defund[]" it effectively "hamper[s] Plaintiff's advocacy, and ability to assemble and freely associate, in violation of the First Amendment." Doc. 29 at 8. Plaintiff analogizes to other cases linking funding with speech, including *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), and *Planned Parenthood Association of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016). *Id.* Defendants reply that these cases are inapposite and that Plaintiff has not been deprived of any funding to which it is legally entitled, but only brought into compliance with regulations dictating how purse money is to be kept and disbursed. Doc. 35 at 9–10.

It appears that Plaintiff's citation of *Citizens United* was simply to indicate that in certain circumstances, "spending money is essential to disseminating speech." Doc. 29 at 8. This is true: *Citizens United* held that a particular law's "prohibition on corporate independent expenditures is thus a ban on speech" because by limiting the amount of money an entity may spend during a campaign, the law necessarily limits the number and depth of issues the entity may discuss. 558 U.S. at 339 (citation omitted). However, as Defendants note, this analysis is specific to the context of federal laws limiting corporate electioneering communications, and Plaintiff does not indicate

how the same rationale would apply here. *See* Doc. 35 at 8. The Court therefore interprets Plaintiff's citation as a general example of how funding is connected to First Amendment free speech rights, not as an argument to apply the rationale of *Citizens United* to the present case.

Plaintiff discusses *Herbert* in more depth. In *Herbert*, plaintiff Planned Parenthood Association of Utah ("PPAU") received federal funding administered by the Utah Department of Health. 828 F.3d at 1248. After a controversial and unsubstantiated video was released linking Planned Parenthood (not PPAU specifically) to sales of fetal tissue, the governor of Utah issued a directive for the Utah Department of Health to cease accepting federal funds for a program PPAU had been running. *Id.* at 1250–51. The Tenth Circuit considered the "unconstitutional conditions doctrine," which forbids the government from "deny[ing] a benefit to any person because he exercises a constitutional right," and found that the governor's political statements about PPAU and admissions in court gave credence to the theory that he acted with retaliatory intent to punish PPAU for its pro-abortion advocacy. *Id.* at 1258, 1262. The court concluded that a reasonable factfinder would likely believe that the governor considered the video an "opportunity to take public action against PPAU, deprive it of pass-through federal funding, and potentially weaken the organization and hamper its ability to provide and advocate for abortion services." *Id.* at 1262.

*Herbert* differs meaningfully from the present case because Plaintiff does not invoke the unconstitutional conditions doctrine. Even if Plaintiff had made an unconstitutional conditions argument, the denial of benefits in *Herbert* involved federal funding to which PPAU was legally entitled. The Tenth Circuit cites only to government-provided benefits—subsidies, tax breaks, public employment, a government contract, and so on—as support for an unconstitutional conditions claim. *See id.* at 1259. In contrast, Plaintiff's membership dues are not a government-provided benefit; the complaint does not indicate any regulatory or statutory entitlement to

collection of these dues. *See generally* Doc. 4. The only money to which Plaintiff could plausibly demonstrate a legal entitlement is the 20% of interest on the accounts it manages, which is documented in NMSA § 60-2E-47(E).[2] The complaint contains no allegation that this money has been affected. *See generally* Doc. 4. Therefore, *Herbert* is inapplicable based on these differences in entitlement to funding. Plaintiff's allegations that Defendants infringed upon its rights of assembly and association, taken as true, do not reach the plausibility standard necessary to survive a motion to dismiss.

## II.     First Amendment Retaliation

Plaintiff argues that Defendants issued their order in retaliation for Plaintiff's decision to file a declaratory judgment lawsuit against Defendants. Doc. 29 at 9. Defendants reply that the order does not interfere with Plaintiff's ability to collect membership contributions from individual horsemen; it only prohibits the automatic withdrawal of funds from each horseman's purse winnings before the horsemen actually receive those winnings. Doc. 35 at 11.

Retaliation is an infringement upon freedom of speech. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (citing examples of "prosecution, threatened prosecution, bad faith investigation, and legal harassment" (citation omitted)). To prove retaliation, a plaintiff must demonstrate that it "engaged in constitutionally protected activity," that the defendant acted to cause the plaintiff "an injury that would chill a person of ordinary firmness from continuing to

---

[2] This text reads as follows: "In addition to the gaming tax, a gaming operator licensee that is a racetrack shall pay twenty percent of its net take to purses to be distributed in accordance with rules adopted by the state racing commission. **An amount not to exceed twenty percent of the interest earned on the balance of any fund consisting of money for purses distributed by racetrack gaming operator licensees pursuant to this subsection may be expended for the costs of administering the distributions.** A racetrack gaming operator licensee shall spend no less than one-fourth percent of the net take of its gaming machines to fund or support programs for the treatment and assistance of compulsive gamblers." (emphasis added).

engage in that activity," and that the defendant's action was "substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Id.* (citation omitted).

Here, Defendants' argument implicitly centers on whether they caused Plaintiff an injury: because Plaintiff may still collect membership fees by other means, and because Defendants never "funded" Plaintiff, Defendants argue that they have not "defunded" Plaintiff through this order and have not caused any injury. An "injury" is "an adverse consequence that the plaintiff suffers at the hands of the defendant." *Irizarry v. Yehia*, 38 F.4th 1282, 1288 n.6 (10th Cir. 2022) (citing to other cases for examples of withdrawal of job offer, arrest, or physical or verbal intimidation); *see also Perez v. Ellington*, 421 F.3d 1128, 1132 (10th Cir. 2005) (irregular tax investigations and delays in releasing the tax liens following those investigations constituted injuries that could chill person of reasonable firmness).

The cases that perform this analysis tend not to consider what conduct constitutes an injury in isolation. Rather, their approach is to examine whether the conduct, whatever it may be, would be sufficient to chill a person of reasonable firmness from continuing to engage in the protected activity. *See Irizarry*, 38 F.4th at 1292–93 (shining flashlight at camera of person filming traffic stop would chill conduct, especially followed by "gunning" police vehicle toward persons filming); *Perez*, 421 F.3d at 1132 (examining, under the second *Worrell* factor, "whether the type of conduct above [irregular tax investigation and delay in releasing liens afterward] is so egregious that an official would be on clear notice that his actions would deter the ordinary person from continuing in that association" and finding that it could be).

It is true that, as outlined in the previous section, Plaintiff has demonstrated no legal entitlement to its membership dues. It cites no statute or regulation promising the ability to collect them. However, Plaintiff has alleged significant reliance on these membership dues for its

continued functioning because the 20% of interest on the accounts it manages, to which it is legally entitled, is insufficient for Plaintiff's continued operation. Doc. 4 ¶¶ 59, 62–63. Plaintiff also alleges that it received no notice or opportunity to be heard before Defendants made this decision. *Id.* ¶ 77. Essentially, the effect of Defendants' action is to mandate a significant restructuring in how Plaintiff funds itself in order for it to continue functioning, and to do so without notice or a transitionary period. While Defendants' decision to require Plaintiff to fund itself through a different procedure is not, on its face, a clear violation of the law, neither is shining a flashlight in a video journalist's face at a traffic stop or withdrawing a job offer. The critical point of the analysis is that a reasonable entity could feel chilled about its expression of free speech if the response to that speech was to force it, without notice, to restructure its funding methodology.

There are, of course, two other prongs to this analysis. However, because Defendants' motion to dismiss does not challenge the first or third element of the retaliation claim, the Court need not discuss them. Therefore, the Court finds that Plaintiff has stated a claim for retaliation at this stage.

### III. First Amendment Speech Rights

Plaintiff alleges that Defendants violated its right to freedom of speech by preventing it from speaking at the May 20, 2021 Commission meeting that led to the order at issue in this case except through its attorney or as individual horsemen. Doc. 4 ¶¶ 125, 168; Doc. 29 at 13. Defendants reply that the limitation was only put in place due to the ongoing lawsuit between Plaintiff and Defendants, and because Plaintiff could still communicate through its attorney or as individual horsemen, the limitation did not violate Plaintiff's free speech rights. Doc. 35 at 6.

To determine what restrictions on speech are permissible at a Commission meeting, the Court first undertakes a forum analysis. "[I]n traditional public forums, such as public streets and

parks," courts employ a strict scrutiny analysis. *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). The same is true of designated public forums, where "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Id.* In limited public forums, where the government opens property solely for a particular group or discussion of a particular subject, the government "may impose restrictions on speech that are reasonable and viewpoint-neutral." *Id.* A limited public forum best fits the description of a Commission meeting: a meeting for the express purpose of discussing Commission business. *See* Doc. 29 at 14; Doc. 35 at 6.

Plaintiff argues that the intent of prohibiting it from speaking at the meeting, except through an attorney or individual horsemen, was to limit dissenting speech. Doc. 29 at 15–16. But the complaint makes clear that Plaintiff's attorney could speak on its behalf, and the individual horsemen could speak as individuals, and there are no allegations that the attorney's speech or individual horsemen's speech were limited by viewpoint in any way. Given that Plaintiff was in litigation with Defendants at the time of the meeting, requiring Plaintiff to speak through an attorney or as individuals is a reasonable limitation in context. Plaintiff makes no argument as to how this restriction on speech prevented it from expressing its opinion, albeit through counsel or individuals. Accordingly, the Court finds that Plaintiff fails to state a claim on this count.

## IV. Fifth and Fourteenth Amendment Property Interest

Plaintiff argues that its membership dues are a property interest which Defendants took away without due process of law in violation of the Fifth and Fourteenth amendments. Doc. 29 at 16. Defendants reply that the membership dues are not a protected property interest because Plaintiff can claim no legal entitlement to them. Doc. 35 at 2–3.

For an unconstitutional deprivation of property in the form of a benefit, a plaintiff must demonstrate a legitimate property interest in the benefit at issue—a "legitimate claim of entitlement" rather than a "unilateral expectation" or "abstract need or desire" and one that derives from an independent source of law that supports the claim to entitlement. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1978). Discretionary government grants do not suffice. *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005).

Plaintiff cites to several cases attempting to highlight parallels to its circumstances, but none of them are analogous. *See* Doc. 29 at 16–18 (citing cases). *Gilhaus v. Gardner Edgerton Unified School District No. 231*, 138 F. Supp. 3d 1228 (D. Kan. 2015) involved a property interest in continued employment. *Ohio Hospital Association v. Ohio Department of Human Services*, 579 N.E.2d. 695 (Ohio 1991) involved a property interest in Medicaid reimbursement rates. *United States v. Chalmers*, 474 F. Supp. 2d. 555 (S.D.N.Y. 2007) involved a property interest in a mandatory government distribution of humanitarian aid. What all of these cases have in common is that the property interest was enshrined in law or a government's contractual obligation: an employment contract for a public school superintendent in *Gilhaus*, Medicaid reimbursement rates in *Ohio Hospital Association*, and humanitarian funding outlined by imperative language in a United Nations resolution and accompanying memorandum of understanding in *Chalmers*. However, the only funding for which Plaintiff has cited an entitlement at law is the 20% of interest on the accounts it manages, which derives from NMSA § 60-2E-47(E). This section of the New Mexico code does not discuss Plaintiff's ability to collect membership fees, and Plaintiff does not point to another statute, regulation, or contract with a governmental entity providing this funding.

Instead, Plaintiff cites to another provision that allegedly requires it to take certain actions with regard to off-track wagering. *See* Doc. 35 at 20 n.5 (citing 15 U.S.C. § 3004). Plaintiff argues

that this law means that Plaintiff's existence is "mandated," and Plaintiff cannot perform this role or any other role if it ceases to exist due to lack of funding. *Id.* Without reaching the question of whether Plaintiff's existence is legally mandated, the Court finds that this argument misses the mark. Even *if* Plaintiff's existence is required by law, Defendants have not forbidden Plaintiff from funding itself entirely; Plaintiff may seek to fund itself in other ways, even if those ways may be less efficient. *See id.* at 21 (discussing logistical challenges of other methods of funding). Perhaps the inefficiencies of other funding methods will necessitate additional staffing and higher membership fees to compensate, or perhaps the logistical difficulties will be simpler to resolve in practice than they seem to Plaintiff in theory. Regardless, Plaintiff's purportedly mandated existence does not transform its specific methodology for collecting membership dues into a protected property interest under the Fifth and Fourteenth Amendments.

Plaintiff argues that the longstanding conduct of the parties supports its ability to collect membership dues in the specific manner that Defendants disallowed, citing to *Robbins v. United States Bureau of Land Management* for the prospect that "mutually explicit understandings" can establish a protected property interest. *See* Doc. 29 at 20 (citing 438 F.3d 1074, 1085 (10th Cir. 2006)). More specifically, in *Robbins*, the Tenth Circuit considered whether a property interest derived from a settlement agreement between the plaintiff and the Bureau of Land Management. *See* 438 F.3d at 1077–78. But Plaintiff identifies nothing explicit—no memorandum or contract, for example—between it and Defendants that promises the right to continue collecting membership dues in the manner it had done before Defendants stopped it.[3] Therefore, any understanding Plaintiff may have had was not *mutually* explicit.

---

[3] One of the cases to which *Robbins* cites for its language on mutually explicit understandings dealt with the "common law" of a public university's unofficial practices for awarding tenure. *Perry v. Sindermann*, 408 U.S. 593 (1972). *Perry* found that the plaintiff should have the

Accordingly, the Court concludes that Plaintiff has failed to state a claim for a violation of the Fifth and Fourteenth Amendments because it has not demonstrated a protected property interest in collecting its membership dues by deducting them automatically from members' purse money.

## V.     Qualified Immunity

Because Plaintiff states a claim only for First Amendment retaliation, the Court only addresses qualified immunity with regard to that claim.

Plaintiff argues that it is too early to decide the qualified immunity question because discovery has not yet been conducted. Doc. 29 at 13. Plaintiff cites a Third Circuit case, *Larsen v. Senate of the Commonwealth of Pennsylvania*, 154 F.3d 82 (3d Cir. 1998), which held that the First Amendment retaliation claim at issue required factual inquiries and therefore qualified immunity could not be resolved on the pleadings. Doc. 29 at 13. While the Court appreciates the wisdom of other circuits, it looks primarily to the Tenth Circuit for guidance in approaching this issue.

The Tenth Circuit has held that the question of qualified immunity should be addressed "at the earliest possible stage in litigation." *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995)). However, the Tenth Circuit has also held that an assertion of qualified immunity may be dismissed as premature at the pleading stage but reasserted at the summary judgment stage, once more facts exist to support it. *Seamons*

---

opportunity to prove that the "policies and practices of the institution" provided him with an interest in tenure that rose to the level of a protected property interest. *Id.* at 603. Plaintiff does not cite to *Perry*, so the Court addresses it only briefly to observe that even *Perry* involved a contractual employment relationship; the holding simply left open the possibility that an extracontractual property interest might exist based on a system the university had created in practice. Again, no contractual relationship is alleged between Plaintiff and Defendants in this case, which provides no basis for a claim that Defendants had promised Plaintiff the right to continue collecting membership fees in the manner it had done previously.

*v. Snow*, 84 F.3d 1226, 1238 (10th Cir. 1996). Therefore, precedent from within this circuit allows for what is essentially a deferral of the qualified immunity question until sufficient evidence exists to reconsider it. However, this deferral is better considered an initial denial of qualified immunity followed by a later opportunity to argue the issue again, which means that the plaintiff still bore the burden of overcoming qualified immunity on the pleadings the first time.

At the motion to dismiss stage, the Court takes Plaintiff's allegations as true: that is, the Court examines whether the complaint states a claim for a violation of clearly established law. *See Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). As established above, the Amended Complaint does state a claim for violation of First Amendment rights through retaliation, so Plaintiff has met the first prong. For the second prong, a right is clearly established when there is a Supreme Court or Tenth Circuit decision on point or "the clearly established weight of authority from other courts" supports the right. *Id.* (quoting *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196–97 (10th Cir. 2010)). Plaintiff has made no substantive allegations that the law was clearly established such that the individual Defendants should have been on notice that their conduct violated the First Amendment. *See generally* Doc. 29. Plaintiff makes general statements about the law being clearly established but cites no case law to support it; instead, Plaintiff cites only cases that explain why the order could be considered retaliation more generally. As a result, the Court must find that Plaintiff has not carried its burden to allege facts sufficient to overcome qualified immunity, and therefore, the Court must dismiss the retaliation claims against the individual Defendants.

## CONCLUSION AND ORDER

The Court dismisses all federal claims in their entirety for failure to state a claim upon which relief can be granted, except for retaliation under the First Amendment. The Court dismisses

the retaliation claim against all individual Defendants based on qualified immunity. Therefore, the only remaining federal claim is First Amendment retaliation against the Commission.

    **IT IS SO ORDERED**.

                                                _____
                                                JERRY H. RITTER
                                                UNITED STATES MAGISTRATE JUDGE